IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

METROPOLITAN LIFE INSURANCE CO.,

Plaintiff,

v.  Civil Action No. 3:09-CV-572-JAG

GWENDOLYN KAY LEICH-BRANNAN, *et al.*,

Defendants.

**MEMORANDUM OPINION**

This matter is before the Court on cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. The material facts in this case are simple, undisputed, and stated clearly in the complaint. The law is crystal clear and mandates but one conclusion. Nevertheless, the parties have turned this unassuming case into a battle royal.

Metropolitan Life Insurance Company ("MetLife") filed this suit seeking a declaratory judgment to establish the proper beneficiaries of a life insurance policy. The Mobil Oil Company provided the policy as an employment benefit of Adolph Julius Leich ("Adolph"), whose life the policy insured. Because the policy is an employment benefit, it is governed by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1001-1461. Pursuant to ERISA, MetLife asks the Court to determine which of Adolph's survivors are entitled to benefits under the policy. The defendants in the case are Lois A. Leich ("Lois") (Adolph's widow); Patricia A. Leich ("Patricia") (Adolph's ex-spouse); and Gwendolyn Kay Leich-Brannan ("Gwendolyn") and Julius Keith Leich ("Julius") (Adolph's children). Among

the potential beneficiaries, Patricia is squared off against Lois, Gwendolyn, and Julius in the fight for the insurance proceeds.

Pursuant to Adolph's final designation of policy beneficiaries, MetLife paid the insurance proceeds to Lois, Gwendolyn, and Julius. After the distribution, Patricia demanded the proceeds. MetLife, therefore, filed suit and now seeks summary judgment as to the proper beneficiaries of the decedent's life insurance proceeds. Oddly, however, MetLife does not suggest how the Court should rule; it does not even argue that it disbursed the funds correctly. Julius also seeks summary judgment, contending that MetLife properly paid the proceeds to himself, Lois, and Gwendolyn. Lois, Gwendolyn, and Patricia proceed *pro se* in this case, and have not moved for summary judgment.

For the reasons stated below, the Court finds that MetLife properly paid out the life insurance benefits to Lois, Gwendolyn, and Julius, and therefore grants Julius's motion for summary judgment. The Court also grants Julius's motion to award him attorneys' fees, albeit in a dramatically reduced amount than he requests. Although MetLife has moved for summary judgment, its motion is denied because it did not urge any particular result.[1]

## I. Standard of Review

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The relevant inquiry in a summary judgment analysis is "whether the evidence presents a sufficient

---

[1] Federal Rule of Civil Procedure 56(a) provides that a party moving for summary judgment must show that "it is entitled to judgment as a matter of law." Because MetLife does not advocate that anyone is entitled to judgment, the Court cannot grant summary judgment in its behalf.

2

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). In reviewing a motion for summary judgment, the Court must view the facts in the light most favorable to the non-moving party. *Id.* at 255. In reviewing cross motions for summary judgment, as in the immediate case, the Court must review each motion separately on its own merits "'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Phillip Morris, Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997)).

Summary judgment must be granted if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To defeat an otherwise properly supported motion for summary judgment, the nonmoving party "must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, the mere existence of a scintilla of evidence, or the appearance of some metaphysical doubt concerning a material fact." *Lewis v. City of Va. Beach Sheriff's Office*, 409 F. Supp. 2d 696, 704 (E.D. Va. 2006) (internal quotation marks and citations omitted). Of course, the Court cannot weigh the evidence or make credibility determinations in its summary judgment analysis. *Williams v. Staples, Inc.*, 372 F.3d 662, 667 (4th Cir. 2004).

## II. Statement of Material Facts

Applying the standard discussed above, the Court has concluded that the following narrative represents the facts for purposes of resolving the motions for summary judgment.

Adolph was a participant in the Mobil Oil Corporation Life Insurance Program (the "Plan"), an employee welfare benefit plan governed by ERISA. (Compl. ¶ 10.) MetLife is the

claims fiduciary for the Plan. (*Id.*) On July 2, 1984, Adolph and his then-current wife, Patricia, divorced. (*Id.* ¶ 14.) Their property settlement agreement, made a part of their Judgment for Dissolution of Marriage, stated that "[Adolph] agrees to make [Patricia], his irrevocable beneficiary on all of his personal and group life insurance, to maintain all such insurance in force and to produce proof of such irrevocability for [Patricia]." (*Id.* ¶ 15.) Pursuant to the property settlement agreement, Adolph submitted a beneficiary designation form naming Patricia as the primary beneficiary and Julius as the contingent beneficiary under the Plan. (*Id.* ¶ 16.)

Three years later, however, Adolph changed the designation. Having remarried, he decided to make his new wife one of the beneficiaries. Thus, in 1987 Adolph submitted a second beneficiary designation form, naming Lois (his new wife), and his children, Julius and Gwendolyn, as the primary beneficiaries. (*Id.* ¶ 17.) Patricia was no longer a beneficiary.

On October 10, 2008, Adolph died. At that time, the death benefit totaled $54,800.00, plus any applicable interest. (*Id.* ¶¶ 18-19.) Lois, Julius,[2] and Gwendolyn filed their claims on November 3, 12, and 15, 2008, respectively. Pursuant to the second beneficiary designation form, MetLife paid out the full policy benefits to Lois, Julius, and Gwendolyn. Lois received 34% of the plan benefits while Julius and Gwendolyn received 33% each.[3] (*Id.* ¶ 21.) Each of the children received roughly $18,300.

On March 13, 2009, Patricia sent a letter to the Exxon Mobil Benefits Service Center stating that she was the proper beneficiary of the plan benefits. Patricia included the divorce

---

[2] Julius contends that MetLife contacted him upon the Decedent's death and provided him with a claim form. MetLife denies initiating contact with Julius. This factual dispute is not material to the questions of law decided in these motions.

[3] Julius contends that he deposited his share of the plan benefits into his personal bank account, commingling them with his personal funds. He further maintains that he has spent his share of the plan benefits. This factual dispute is not material to the questions of law decided in these motions.

decree which incorporated the separation agreement in which Julius promised to keep Patricia as the beneficiary on his insurance. MetLife contends it received a copy of this letter from the Plan's record-keeper on or around May 4, 2009.[4] Having already paid the benefits to Lois, Julius, and Gwendolyn, MetLife filed the instant action, seeking a declaratory judgment as to the proper beneficiary or beneficiaries of the policy.

### III. Discussion

*A. Plan Documents Rule*

The Fourth Circuit has observed that the Supreme Court's decision in *Kennedy v. Plan Administrator for Dupont Savings & Investment Plan*, 129 S. Ct. 865 (2009), represents a "broad endorsement" of the plan documents rule. *Boyd v. Metro. Life Ins. Co.*, 636 F.3d 138, 140 (4th Cir. 2011). Under the plan documents rule, "plan administrators look solely at 'the directives of the plan documents' in determining how to disburse benefits." *Id.* (quoting *Kennedy*, 129 S. Ct. at 875).

The plan documents rule requires a plan administrator to act solely in accordance with the plan documents, so long as the documents are consistent with other provisions of ERISA. The plan documents are official forms provided by the administrator; as relevant here, the form used to designate beneficiaries is a plan document. The rule gives "a plan participant a clear set of instructions for making his own instructions clear," and "forecloses any justification for enquiries into nice expressions of intent." *Kennedy*, 129 S. Ct. at 875. The plan documents rule allows for "simple administration, avoiding double liability, and ensuring that beneficiaries get what's coming quickly, without the folderol essential under less-certain rules." *Id.* at 875-76

---

[4] Patricia contends that counsel for MetLife had acknowledged that it had received notice as early as 2005 as to Patricia's claim for benefits. This factual dispute is not material to the questions of law decided in these motions.

5

(citation and internal quotation marks omitted). Adherence to the plan documents rule avoids the "cost of less certain rules," which would require plan administrators "to examine a multitude of external documents that might purport to affect the dispensation of benefits." *Id.* at 876 (citation and internal quotation marks omitted).

Pursuant to *Boyd* and *Kennedy*, the Court finds that the plan documents rule applies to the instant case. There is no dispute that the most current beneficiary designation received by MetLife in 1987 indicates Julius, Lois, and Gwendolyn as the beneficiaries. Accordingly, unless there is an exception to the plan documents rule, MetLife properly paid the benefits in accordance with the relevant plan document—the second beneficiary designation.

### B. Whether QDRO Provisions Apply to Welfare Plans

A Qualified Domestic Relations Order ("QDRO") is a judgment or order made pursuant to state domestic relations law that establishes the right of an alternate payee to receive benefits payable under an ERISA plan. *See* 29 U.S.C. § 1056(d)(3)(B)(i). In effect, a QDRO is an exception to the plan documents rule, pursuant to which a plan trustee can pay directly the plan benefits described in the QDRO.

In the instant case, the Decedent's benefit plan is a life insurance plan, which is a "welfare benefits" plan. ERISA recognizes two different types of plans. "Pension plans," as the name suggests, provide pensions to retired employees. In contrast, "welfare benefit plans" provide other kinds of benefits to employees, such as, in this instance, life insurance. In a recent decision, the Fourth Circuit has said that the distinction between welfare benefit plans and pension plans is "not . . . significant" as to the plan documents rule. *Boyd*, 636 F.3d at 142. *Boyd* did not involve a QDRO-related exception, but instead related to a waiver of an ex-husband's claim to his ex-wife's employee welfare plan. After signing the property settlement

agreement, the decedent (the ex-wife) never changed the beneficiary designation on file with MetLife, meaning that the ex-husband remained the primary beneficiary under her plan. *Id.* at 139. The court held that the plan documents rule applied equally to both pension and welfare benefit plans, stating:

> Neither *Kennedy* nor 29 U.S.C. § 1104(a)(1)(D) provides any basis for concluding that the plan documents rule only applies to employee pension benefit plans. Indeed, in deciding to broadly endorse the plan documents rule, *Kennedy* drew upon case law involving employee welfare benefit plans—an odd decision if employee welfare benefit plans and employee pension benefit plans were somehow different.

*Id.* at 142 (citations omitted). In short, the plan documents rule applies to welfare benefit plans.

The principle enunciated in *Boyd* is not new law. Thirteen years earlier, in *Metropolitan Life Insurance v. Pettit*, the Fourth Circuit said that because ERISA's preemption provisions apply "equally to all ERISA plans, and is not limited to pension plans," the QDRO exception applies to welfare benefit plans. *Pettit*, 164 F.3d 857, 863 n.5 (4th Cir. 1998); *see also Metro. Life Ins. Co. v. Marsh*, 119 F.3d 415, 421 (6th Cir. 1997) (explaining that the QDRO exception applies to both welfare benefit plans and employee pension plans); *Metro. Life Ins. Co. v. Wheaton*, 42 F.3d 1080, 1084 (7th Cir. 1994) (explaining that the plain meaning of the ERISA provisions establishes an exception to preemption for QDROs pertaining to all ERISA plans, not just pension plans).

Consistent with the Fourth Circuit's ruling in *Boyd* and *Petit*, the Court finds that the QDRO exception to the plan documents rule applies to employee welfare benefit plans such as Adolph's insurance policy.

*C. Whether the Property Settlement Agreement Is a QDRO*

Because the Court finds that the QDRO exception can apply in this case, it must determine whether the divorce decree between Adolph and Patricia and incorporated property

settlement agreement satisfied the requirements to be considered a QDRO. If the agreement qualifies as a QDRO, Patricia will be the proper beneficiary of the insurance policy. If not, Lois, Julius, and Gwendolyn will be the proper beneficiaries.

The divorce decree and incorporated agreement are not a QDRO. To qualify as a QDRO, and judgment and property settlement agreement must meet the statutory requirements of ERISA. First, the order must "relate[] to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant." 29 U.S.C. § 1056(d)(3)(B)(ii). The order must also meet certain statutory specifications set forth by 29 U.S.C. § 1056(d)(3)(C). Specifically, to be a QDRO, the order must specify:

(i) the name and the last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order,
(ii) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined,
(iii) the number of payments or period to which such order applies, and
(iv) each plan to which such order applies.

*Id.* § 1056(d)(3)(C).[5]

This Court has required strict compliance with the statutory specifications. In *Wade v. Hampton Roads Shipping Ass'n*, No. 2:07cv347, 2007 WL 3376652, at *4 (E.D. Va. Nov. 7, 2007) (citations omitted), this Court stated: "Courts have strictly applied [the statutory QDRO requirements] and have held that a domestic relations order that does not include all of this information cannot be considered a QDRO." The Court found that the separation agreement in question was not a QDRO because it "fail[ed] to specify the particular retirement plan it is

---

[5] 29 U.S.C. § 1056(d)(3)(D) sets forth certain other requirements that a domestic relations order must satisfy to be a QDRO that are not at issue in the instant motions. (For example, a QDRO cannot require more than is allowed by the plan, either in the context of increased benefits or by providing options not otherwise available under the plan.)

referencing and fail[ed] to specify the number of payments or applicable period of time to which it applies as required by statute." *Id.*; *see also Deaton v. Cross*, 184 F. Supp. 2d 441, 443 (D. Md. 2002) (finding that the separation agreement was not a QDRO because "it did not specify the percentage or method of distribution of life insurance proceeds" and "did not provide the mailing addresses of the decedent or that of the children").[6]

In *Board of Trustees of Plumbers & Pipefitters National Pension Fund v. Saxon*, 470 F. Supp. 2d 605, 609 (E.D. Va. 2007), this Court noted that the separation agreement did not meet the QDRO requirements because it "fail[ed] to identify the relevant pension funds, and [did] not specifically require the Pension Fund to do anything or pay any benefits." On appeal, the Fourth Circuit affirmed this Court's grant of summary judgment upholding the plan's award of benefits to the person designated on the decedent's beneficiary designation, instead of to the ex-wife, who was named in the property settlement agreement. The Fourth Circuit's commentary on this issue is brief: "We have reviewed the record and find no reversible error in the district court's finding that the pension benefits at issue were properly paid out to Bessie Saxon rather than Virginia Sprague." 251 F. App'x 155, 155 (4th Cir. 2007) (per curiam) (affirming on the issue of distribution of benefits but vacating and remanding on the issue of attorneys' fees and costs).

The property settlement agreement in this case does not satisfy the statutory criteria. The property settlement agreement fails to satisfy the fourth requirement of 29 U.S.C. § 1056(d)(3)(C), namely, the identification of the plan to which the property settlement agreement applies. (*See* MetLife Combined Opp'n & Reply Mem. 7; Julius Reply Mem. 6.) Further, the Leiches's property settlement agreement does not specify any amount to be awarded to Patricia.

---

[6] The District of Maryland emphasized, however, that it would not rely on the absence of mailing addresses as the sole reason for determining that the separation agreement was not a QDRO. *See Deaton*, 184 F. Supp. 2d at 443-44.

Thus, the Court finds that the property settlement agreement was not a QDRO, as it did not identify the specific plan to which the agreement applies, or specify the amount or percentage of the plan Patricia was to be awarded.

Since the agreement was not a QDRO, the plan document rule required MetLife to distribute the funds to Lois, Gwendolyn, and Julius. They are the proper beneficiaries under Adolph's life insurance policy.

*D. Whether Julius is Entitled to Attorneys' Fees*

Under ERISA, a "court in its discretion may allow a reasonable attorneys' fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). The Fourth Circuit has set forth a two-step procedure for district courts to follow when determining whether to award attorneys' fees under ERISA. First, the party seeking attorneys' fees must have achieved "some degree of success on the merits." *Williams v. Metro. Life Ins. Co.*, 609 F.3d 622, 634-36 (4th Cir. 2010) (explaining the alterations to the test for attorneys' fees under ERISA in light of the Supreme Court's decision in *Hardt v. Reliance Standard Life Insurance Co.*, 130 S. Ct. 2149 (2010)); *see also Rinaldi v. CCX*, 388 F. App'x 290, 297 (4th Cir. 2010) (employing the revised two-step test). *But see DuPerry v. Life Ins. Co. of N. Am.*, 632 F.3d 860, 876-77 (4th Cir. 2011) (using the previous test, which consists of only the second step of the two-step test articulated in *Williams* and *Rinaldi*).

The Court next considers the following five factors to decide whether a prevailing party should receive attorneys' fees: (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees would deter other persons from acting under similar circumstances; (4) whether the parties requesting the attorneys' fees sought to benefit all participants and beneficiaries of an

ERISA plan or resolve a significant legal question regarding ERISA itself; and (5) the relative merit of the parties' position. *Williams*, 609 F.3d at 635; *Rinaldi*, 388 F. App'x at 297. These five factors are "general guidelines" for the Court to follow. *Williams*, 609 F.3d at 635. Although each factor may not be applicable in a given case, the Court should consider (and articulate) each of the five factors. *See Mid Atl. Med. Servs., LLC v. Sereboff*, 407 F.3d 212, 221 (4th Cir. 2005) ("[I]t is essential, in order to ensure an adequate basis for review, for the trial court to have addressed each factor." (citation and internal quotation marks omitted)).

The Court first must identify the prevailing party. Incredibly, MetLife argues that Julius is not a prevailing party, but that MetLife is. Julius has convinced the Court that he deserved the benefits under the life insurance policy. MetLife's suit put in jeopardy the money Julius received from the insurance company. In today's ruling, the Court holds, in essence, that Julius gets to keep the money. Julius is the quintessential prevailing party: he got the result he wanted in the case. Certainly, Julius achieved "some degree of success on the merits."

MetLife, however, says that *it* is the prevailing party. MetLife says that it prevailed because it pointed out to the Court that no factual disputes exist in the case, so the Court should enter summary judgment. The problem is that MetLife did not suggest who should win the suit. While it is true that the Court has entered summary judgment, MetLife is not a prevailing party. Unlike Julius, MetLife did not get the result it wanted because it never took a position on what it wanted. MetLife did not assert that anyone should win the case, only that the case should be decided.

Having decided that Julius is a prevailing party, the Court must apply the five factors required by *Williams* to the present action, to decide if Julius is entitled to attorneys' fees. As to the first factor, it does not appear that MetLife has acted in bad faith or any other culpable

manner, in its initial distribution of the benefits. In fact, the Court has concluded that MetLife paid the correct beneficiaries. Although MetLife arguably should have filed an interpleader before disbursing the benefit payments if it was unsure of the proper beneficiaries, the Court finds that its actions do not rise to the level of "more than merely negligent." *Williams*, 609 F.3d at 636.

Bad faith, however, can also occur in the conduct of ERISA litigation. *See, e.g., Brooks v. Metrica, Inc.*, 1 F. Supp. 2d 559, 569 (E.D. Va. 1998); *see also AmSouth Bank v. Dale*, 386 F.3d 763, 790 (6th Cir. 2004) (citation omitted) (finding bad faith during the course of litigation in a declaratory judgment action against receivers for insurance companies). Although MetLife commenced the suit and haled the defendants into court, it steadfastly took no position in the case—it would not even argue that it had distributed the proceeds properly. As discussed above, the facts and law in this case are simple, but MetLife insists that it can file a suit and let the Court sort things out, however the Court sees fit.[7]

Interestingly, MetLife declined to offer an opinion on the central issue of the case: the QDRO exception. In its Complaint, MetLife said that the only issue before the Court was whether the property settlement Agreement is a QDRO. (Comp. ¶¶ 24-26.) Yet, MetLife came to oral argument and refused to take a position on the issue. Only when prodded did MetLife offer an opinion about the validity of the agreement as a QDRO.

MetLife initiated this action—thereby compelling Julius to seek counsel and incur legal fees—and then refused to take a position on the single legal issue raised in its Complaint. Had

---

[7] In this connection, MetLife argues that the instant case is "in the nature of" an interpleader action. In an interpleader action, a party deposits a sum with the clerk of the court, sues the potential claimants to the money, and lets them fight it out. The instant case is not an interpleader action. MetLife did not deposit any money with the Court, and had already disbursed the funds.

MetLife simply taken the position that it had distributed the benefits legally—a position that is clearly mandated by the facts and law of this case—Julius would have had to spend little, if any, money defending the case. This conduct in litigation unnecessarily imposes a burden on Lois, Gwendolyn, and Julius: each had received a considerable sum in life insurance benefits, but not enough of a king's ransom to spend a fortune defending the case. MetLife's conduct is irresponsible, and borders on bad faith.

Turning to the next factor, the Court recognizes that a large company such as MetLife is able to pay attorneys' fees. While this is not solely determinative of the outcome in this analysis, *see Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1029-30 (4th Cir. 1993), this factor weighs in favor of Julius.

The deterrence factor does not weigh in favor of MetLife or Julius. On the one hand, MetLife paid the proper beneficiaries according to the plan documents rule, so there is no need to deter MetLife, or any other similarly situated party, from similar conduct in the future. On the other hand, MetLife and other insurance companies need to understand not only that commencing litigation is a significant step that frightens lay defendants but also that, when a declaratory judgment suit such as this one is filed, the company needs to take a position.

The fourth *Williams* factor is whether Julius sought to benefit all participants and beneficiaries of an ERISA plan or resolve a significant legal question regarding ERISA itself. Julius sought only to protect himself, his sister, and his step-mother, not a broader class of beneficiaries. This case does not resolve a significant legal question. This factor does not weigh in Julius's favor.[8]

---

[8] At the same time, it does not weigh in MetLife's favor either.

Finally, the fifth *Williams* factor asks which party had a more meritorious position relative to the other. As discussed above, MetLife's position on this issue makes no sense. MetLife argues that since it moved for summary judgment and the Court granted summary judgment, Julius's claim cannot be relatively more meritorious than its own. This argument misses the mark. While it is true that the Court granted summary judgment, MetLife did not take a position on the material issues of the case. Instead, MetLife merely requested a declaratory judgment as to which individuals are the proper beneficiaries. (*See* Compl. 5-6.) Presumably, the Court could have made any decision on who the proper beneficiaries are, and MetLife would still argue that it won the case because of the neutral position it took in the litigation. When a party does not take a position on the outcome of a case, it is difficult to see how that anyone can deem its position meritorious.

Conversely, Julius took a position that he, Lois, and Gwendolyn are the proper beneficiaries under the plan, and requested summary judgment in his favor. The Court granted precisely the relief requested by Julius. Thus, the Court finds that Julius's claim was relatively more meritorious than MetLife's, and the fifth *Williams* factor falls in favor of Julius.

After considering each of the factors set forth in *Williams*, as well as Julius's success on the merits, the Court concludes that, on balance, Julius is entitled to attorneys' fees and costs.

*E. Amount of Attorneys' Fees.*

To calculate reasonable attorneys' fees the Court "must first determine a lodestar figure by multiplying the number of reasonable hours expended times a reasonable rate." *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 243 (4th Cir. 2009) (citing *Grissom v. Mills Corp.*, 549 F.3d 313, 320 (4th Cir. 2008)). According to the Fourth Circuit, reasonable rates and hours are guided by the following twelve factors:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorneys' opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorneys' expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

*Id.* at 243-44 (quoting *Barber v. Kimbrell's Inc.*, 577 F.2d 216, 226 n. 28 (4th Cir. 1978)) (quotation marks omitted). After determining a lodestar figure, the "court then should subtract fees for hours spent on unsuccessful claims unrelated to successful ones." *Grissom*, 549 F.3d at 321. "Once the court has subtracted the fees incurred for unsuccessful, unrelated claims, it then awards some percentage of the remaining amount, depending on the degree of success enjoyed by the plaintiff." *Id.* at 321.

MetLife argues that, if the Court awards fees, it should only award Julius $1,830. It is unrealistic to file a suit in federal court and expect a defendant to hire a lawyer and resolve the case for less than $2,000, especially when the plaintiff throws up its corporate hands and tells the Court simply to decide the case, one way or the other. The Court, therefore, rejects MetLife's bargain-basement approach to attorneys' fees.

Julius uses the opposite tactic, and requests the Court to award $22,000 in attorneys' fees in a case with $18,000 at stake. To justify his request, he says that his lawyers discounted their usual hourly rates for attorneys from $250 to $100 and for paralegals from $100 to $50, and, even at these discounted rates, the lawyers provided a courtesy discount on most bills. At their usual rate, the professional fees would have been $59,985. Costs were over $5,000. These discounts, however, do not justify a $22,000 fee to protect an insurance benefit of $18,000.

15

Every attorney must exercise billing discretion, especially when the lawyer seeks to have a Court order a third party to pay his bills. *See, e.g., Bd. of Educ. v. Summers*, 358 F. Supp. 2d 462, 467-71 (D. Md. 2005). Julius unduly complicated this simple case. As noted at the beginning of this opinion, the material facts are undisputed and were laid out in the Complaint. Julius, however, served extensive and unnecessary discovery touching only marginally on the relevant facts in the case. Julius filed a motion to dismiss that argued, in essence, that an insurance company cannot bring a declaratory judgment action to determine how benefits should be paid.[9] Julius vainly contended that QDROs do not amount to an exception to the plan documents rule. His tactics turned a simple case into complex litigation.

Julius requests too large an attorneys' fee. Applying the *Robinson* criteria to the present case, the Court takes into account the time spent on unsuccessful pursuits, such as the motion to dismiss. The Court notes that this case does not pose novel or difficult questions, that that case is not undesirable, and that Julius's counsel does not appear to have foregone any opportunities in pursuing this case. Of particular significance is the amount in controversy in the present case, which is Julius's $18,300 in life insurance proceeds. The Court finds an amount of $6,100 to be a reasonable award of attorneys' fees, with an award of out of pocket expenses in the amount of $1,000. This amount bears a reasonable relationship to the amount that Julius sought to recover, and also falls within the informal benchmark set by some courts for recovery of attorneys' fees in ERISA actions. *See, e.g., Lutheran Med. Ctr. of Omaha v. Contractors, Laborers, Teamsters & Eng'rs Health & Welfare Plan*, 814 F. Supp. 799, 807 (D. Neb. 1993), *aff'd*, 25 F.3d 616 (8th Cir. 1994) (explaining that in most ERISA cases, an award for attorneys' fees under 29 U.S.C. § 1132(g) should approximate one third of the amount recovered).

---

[9] Contrary to Julius's argument, declaratory judgment actions are numbingly common vehicles to resolve insurance disputes.

## IV. Conclusion

For the reasons set forth above, the Court finds that MetLife properly paid the Decedent's life insurance benefits to Lois, Gwendolyn, and Julius. Because MetLife did not seek this or any ruling, its motion for summary judgment is DENIED. The Court GRANTS Julius's motion for summary judgment and GRANTS Julius's request for attorneys' fees in the amount of $6,100.00 and expenses in the amount of $1,000.00. Although Lois and Gwendolyn have not moved for summary judgment, the Court *sua sponte* GRANTS summary judgment on their behalves, because their positions are identical with that of Julius.

The Court will enter an appropriate order.

/s/ _____
John A. Gibney, Jr.
United States District Judge

Date: July 29, 2011
Richmond, VA